UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN FREYTAG,

     Plaintiff,

v.

FORD MOTOR COMPANY,

     Defendant.

Case No. 15-cv-13569

Honorable Victoria A. Roberts

Magistrate Judge Mona K. Majzoub

_____/

| | |
|---|---|
| GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C.<br>By:  David A. Kotzian (P38308)<br>30500 Northwestern Highway<br>Suite 425<br>Farmington Hills, MI 48334<br>(248) 737-9991<br>dkotzian@gmgmklaw.com<br><br>*Counsel for Plaintiff* | KIENBAUM OPPERWALL<br> HARDY & PELTON, P.L.C.<br>By:  Elizabeth P. Hardy (P37426)<br>    Thomas J. Davis (P78626)<br>280 N. Old Woodward Avenue<br>Suite 400<br>Birmingham, MI  48009<br>(248) 645-0000<br>ehardy@kohp.com<br>tdavis@kohp.com<br><br>*Counsel for Defendant* |

_____

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

Defendant Ford Motor Company ("Ford"), by its attorneys, Kienbaum Opperwall Hardy & Pelton, P.L.C., moves for an order pursuant to Fed.R.Civ.P. 56(c) granting summary judgment on Plaintiff's claims. In support of its motion, Ford states the following:

1.      Plaintiff filed his complaint on September 10, 2015 in the Wayne County, Michigan Circuit Court. The complaint was served on Ford on September 15, 2015, and Ford removed the case to this Court on October 12, 2015. Dkt. 1.

2.      For the reasons set forth in the accompanying brief, there is no genuine dispute as to any material fact arising out of the claims there stated, and Ford is entitled to judgment as a matter of law.

3.      Concurrence in the relief sought herein was requested and was denied, necessitating the bringing of this motion.

WHEREFORE, Ford respectfully requests that the Court grant summary judgment on all counts of Plaintiff's complaint.

Respectfully submitted,

KIENBAUM OPPERWALL
HARDY & PELTON, P.L.C.

s/Thomas J. Davis
By:   Elizabeth P. Hardy (P37426)
       Thomas J. Davis (P78626)
Attorneys for Defendants
280 N. Old Woodward Ave., Ste. 400
Birmingham, MI 48009
(248) 645-0000

ehardy@kohp.com

Dated:  June 10, 2016                    tdavis@kohp.com

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KEVIN FREYTAG,

      Plaintiff,

v.

FORD MOTOR COMPANY,

      Defendant.

Case No. 15-cv-13569

Honorable Victoria A. Roberts

Magistrate Judge Mona K. Majzoub

_____ /

| | |
|---|---|
| GASIOREK, MORGAN, GRECO, McCAULEY & KOTZIAN, P.C. | KIENBAUM OPPERWALL HARDY & PELTON, P.L.C. |
| By:  David A. Kotzian (P38308) | By:  Elizabeth P. Hardy (P37426) |
| 30500 Northwestern Highway | Thomas J. Davis (P78626) |
| Suite 425 | 280 N. Old Woodward Avenue |
| Farmington Hills, MI 48334 | Suite 400 |
| (248) 737-9991 | Birmingham, MI  48009 |
| dkotzian@gmgmklaw.com | (248) 645-0000 |
| | ehardy@kohp.com |
| *Counsel for Plaintiff* | tdavis@kohp.com |
| | |
| | *Counsel for Defendant* |

---

**DEFENDANT'S BRIEF IN SUPPORT OF ITS
MOTION FOR SUMMARY JUDGMENT**

## CONCISE STATEMENT OF ISSUES PRESENTED

1.     A person who needs accommodation under the Americans with Disabilities Act (or parallel state law) is only entitled to a reasonable accommodation, not their preferred accommodation. Medical leave is a reasonable accommodation of a limited-duration disability. Where Plaintiff's doctors said that his May 2014 disability would be of limited duration, Ford gave him disability leave instead of the transfer Plaintiff wanted. Should the Court thus grant summary judgment because Ford reasonably accommodated Plaintiff?

2.     Only disabled people may seek accommodation, and an employer can require proof of a claimed disability. In December 2014, a month after Plaintiff's doctors cleared him to work, Plaintiff again requested a transfer claiming his disability would "recur." Where Plaintiff admits that he was no longer disabled, and never substantiated that his disability would "recur," should the Court grant summary judgment because Plaintiff was not entitled to accommodation?

3.     An employee must propose a reasonable accommodation, and a proposed accommodation that would violate other employee's rights under a collective bargaining agreement ("CBA") is unreasonable. Where Plaintiff's proposed transfer to southeast Michigan, with seniority intact, was not authorized by the CBA, and such a transfer would have violated existing employee's contractual rights by bumping them down in seniority with the disadvantages that

lower seniority entails, should the Court grant summary judgment because the proposed accommodation is unreasonable?

4.      The Sixth Circuit has held that it is not reasonable to request the accommodation of a shorter commute, because that is a personal benefit unrelated to the job. Where Plaintiff's request for a transfer to Michigan near his family home similarly (a) has nothing to do with the workplace; and (b) seeks the same type of personal benefit as the commuter—*i.e.*, a workplace closer to home, should the Court grant summary judgment because the proposed accommodation is unreasonable?

# TABLE OF CONTENTS

CONCISE STATEMENT OF ISSUES PRESENTED ............................................. i

TABLE OF AUTHORITIES .................................................................................. iv

CONTROLLING OR MOST APPROPRIATE AUTHORITIES ........................... vi

STATEMENT OF MATERIAL FACTS ................................................................1

INTRODUCTION ...............................................................................................12

ARGUMENT ......................................................................................................13

I.      Freytag's May 2014 Disability Was Accommodated with
        Medical Leave, and He Was Not Disabled—and Did Not
        Provide Required Proof of Disability—When He Again
        Requested Transfer in December 2014. ......................................................13

II.     Freytag's Proposed Accommodation of a Transfer For His
        Temporary Anxiety and Depression Was Unreasonable. ............................16

        A.      Freytag's proposed transfer would have violated the
                rights of other employees under the Collective
                Bargaining Agreement. ....................................................................17

        B.      Freytag's request to transfer to a facility closer to home is
                unreasonable as a matter of law. ......................................................21

CONCLUSION ...................................................................................................24

# TABLE OF AUTHORITIES

## Cases

*Arthur v. Am. Showa, Inc.*,
  625 F. App'x 704 (6th Cir. 2015).........................................................17

*Blickle v. Ill. Dep't of Children & Family Servs.*,
  2015 WL 5693081 (N.D. Ill. Sept. 28, 2015)....................................21

*Brookins v. Indianapolis Power & Light Co.*,
  90 F. Supp. 2d 993 (S.D. Ind. 2000) ..................................................23

*Burns v. Coca-Cola Enterprises, Inc.*,
  222 F.3d 247 (6th Cir. 2000) ..............................................................18

*Cash v. Siegel-Robert, Inc.*,
  548 F. App'x 330 (6th Cir. 2013)................................................ 15, 16

*Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*,
  155 F.3d 775 (6th Cir. 1998)...............................................................14

*Deister v. AAA Auto Club of Mich.*,
  91 F. Supp. 3d 905 (E.D. Mich. 2015) ...............................................17

*Donald v. Sybra, Inc.*
  667 F.3d 757 (6th Cir. 2012) ..............................................................13

*E.E.O.C. v. Ford Motor Co.*,
  782 F.3d 753 (6th Cir. 2015) ..............................................................17

*E.E.O.C. v. Prevo's Family Mkt., Inc.*,
  135 F.3d 1089, 1094 (6th Cir. 1998)...................................................14

*Gaul v. Lucent Techs., Inc.*,
  134 F.3d 576 (3d Cir. 1998) ...............................................................23

*Hedrick v. W. Reserve Care Sys.*,
  355 F.3d 444 (6th Cir. 2004) ...................................................... 14, 17

*Henschel v. Clare Cty. Rd. Comm'n*,
  737 F.3d 1017 (6th Cir. 2013)..............................................................17

*Jakubowski v. Christ Hosp., Inc.*,
    627 F.3d 195 (6th Cir. 2010) ...................................................................17

*Kempter v. Mich. Bell Tel. Co.*,
    534 F. App'x 487 (6th Cir. 2013) .................................................. 17, 20

*LaResca v. AT&T*,
    161 F. Supp. 2d 323(D.N.J. 2001) ...........................................................21

*Lewis v. Zilog, Inc.*,
    908 F. Supp. 931 (N.D. Ga. 1995) .........................................................23

*Lockard v. Gen. Motors Corp.*,
    52 F. App'x 782 (6th Cir. 2002) .............................................................20

*Melange v. City of Center Line*,
    482 F. App'x 81 (6th Cir. 2012) .............................................................13

*Penny v. UPS*,
    128 F.3d 408 (6th Cir. 1997) .................................................................14

*Rask v. Fresenius Med. Care N. Am.*,
    509 F.3d 466 (8th Cir. 2007) .................................................................22

*Regan v. Faurecia Auto. Seating, Inc.*
    679 F.3d 475 (6th Cir. 2012) ........................................................ 21, 22

*Salmon v. Dade Cnty. Sch. Bd.*,
    4 F. Supp. 2d 1157 (S.D. Fla. 1998) .......................................................21

*U.S. Airways, Inc. v. Barnett*,
    535 U.S. 391 (2002) .................................................................... 18, 21

*Weeks v. Union Pac. R.R. Co.*,
    137 F. Supp. 3d 1204 (E.D. Cal. 2015) .................................................20

**Statutes**

29 C.F.R. § Pt. 1630, App .......................................................................22

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

*Arthur v. Am. Showa, Inc.*,
  625 F. App'x 704 (6th Cir. 2015)

*Brookins v. Indianapolis Power & Light Co.*,
  90 F. Supp. 2d 993 (S.D. Ind. 2000)

*Burns v. Coca-Cola Enterprises, Inc.*,
  222 F.3d 247 (6th Cir. 2000)

*Cash v. Siegel-Robert, Inc.*,
  548 F. App'x 330 (6th Cir. 2013)

*Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*,
  155 F.3d 775 (6th Cir. 1998)

*Donald v. Sybra, Inc.*
  667 F.3d 757 (6th Cir. 2012)

*E.E.O.C. v. Ford Motor Co.*,
  782 F.3d 753 (6th Cir. 2015)

*E.E.O.C. v. Prevo's Family Mkt., Inc.*,
  135 F.3d 1089, 1094 (6th Cir. 1998)

*Gaul v. Lucent Techs., Inc.*,
  134 F.3d 576 (3d Cir. 1998)

*Hedrick v. W. Reserve Care Sys.*,
  355 F.3d 444 (6th Cir. 2004)

*Henschel v. Clare Cty. Rd. Comm'n*,
  737 F.3d 1017 (6th Cir. 2013)

*Jakubowski v. Christ Hosp., Inc.*,
  627 F.3d 195 (6th Cir. 2010)

*Kempter v. Mich. Bell Tel. Co.*,
  534 F. App'x 487 (6th Cir. 2013)

*Lockard v. Gen. Motors Corp.*,
  52 F. App'x 782 (6th Cir. 2002)

*Melange v. City of Center Line*,
   482 F. App'x 81 (6th Cir. 2012)

*Penny v. UPS*,
   128 F.3d 408 (6th Cir. 1997)

*Regan v. Faurecia Auto. Seating, Inc.*
   679 F.3d 475 (6th Cir. 2012)

*U.S. Airways, Inc. v. Barnett*,
   535 U.S. 391 (2002)

29 C.F.R. § Pt. 1630, App.

## STATEMENT OF MATERIAL FACTS

1.      Plaintiff Kevin Freytag started working for Defendant Ford Motor Company in November 1999. Ex. A, Freytag Dep. 32.

2.      From November 2009 to March 2014, Freytag worked at the Romeo Engine plant in Romeo, Michigan. Ex. A, Freytag Dep. 37-38, 41-42. On or before February 2014, he learned that Romeo Engine would be laying off employees, and that based on his low seniority, he would be among those laid off. *Id.* at 43-44.

3.      The 2011 collective bargaining agreement ("CBA") then in effect between Ford and the United Auto Workers ("UAW") provided that certain categories of employees were eligible to transfer to open positions at other plants—largely employees who had been laid off, or who were about to be laid off. Ex. B, Wright Decl. ¶ 6; Ex. C, Roberson Decl. ¶¶ 3-4. A complex set of preferential placement rules governed the transfers. *Id.* Transferring employees would retain their company seniority. Ex. C ¶ 4 & Decl. Ex. 1.

4.      On February 14, 2014, faced with imminent layoff, Freytag applied for—and ultimately received—a transfer to an open position at the Sacramento HVC facility in Manteca, California. Ex. A, Freytag Dep. 42-46 & Dep. Ex. 2. He was eligible for this transfer under the CBA's rules. Ex. C, Roberson Decl. ¶ 6.

5.       The CBA provides that transferring employees are eligible for a Basic Relocation Allowance of $6,000 or an Enhanced Relocation Allowance of

$30,000. *Id.* ¶ 5; Ex. A, Freytag Dep. 48. Employees accepting the Enhanced Relocation Allowance "will not be eligible to initiate another in zone or out of zone transfer as an active employee for a period of 36 months," and "will terminate their seniority at all other Ford locations and, therefore, not be eligible for recall/rehire or Return to Basic Unit." Ex. C, Roberson Decl. ¶ 5 & Decl. Ex. 2.

6.      Freytag took the Enhanced Relocation Allowance. Ex. A, Freytag Dep. 47-49 & Dep. Ex. 3. Freytag understood the consequences of accepting the enhanced allowance, including the limitations on future transfers. *Id.* at 49-50.

7.      On March 12, 2014, Freytag left Michigan for California. *Id.* at 41-42. Freytag's wife and children stayed in Michigan, with Freytag testifying that they were to join him in California after the school year ended. *Id.* at 53.

8.      The week before Easter in 2014, Freytag's wife visited him in California, and expressed her displeasure with the area. *Id.* at 55-58. Freytag and his wife returned to Michigan together, and on the day before Easter, Freytag's wife told him she wanted a divorce. *Id.* at 59-60. Freytag returned, by himself, to California that Sunday evening. *Id.* at 60.

9.      Upon his return to work, Freytag explained his family situation to his union representative and Ford management, asking if there was anything they could do for him. *Id.* at 62-63. Ford District Manager Michael Taylor ultimately approved a two-week personal leave of absence for Freytag. *Id.* at 65. Freytag did

not object to this leave, and does not allege that Taylor did something wrong by offering it. *Id.*

10.     Freytag's leave started in early May 2014. *Id.* at 66. He returned to Michigan, intending to reconcile with his wife and have her come to California as planned. *Id.* at 65, 69-70.

11.     On May 13, 2014, Freytag's primary care physician Theodore Tangelos returned a Medical Certification Form to Ford stating that Freytag was suffering from "anxiety with panic attacks, insomnia, and chest pain" with a "probable duration" of May 25, 2014. Ex. D, Voss Dep. at Dep. Ex. 12. Psychologist Laurie Mastrogianis sent a similar form on May 20, 2014, indicating that the "probable duration" of Freytag's anxiety was 3-6 months, and that Freytag's "mental health will stabilize quicker if relocated back to Michigan." Ex. A, Freytag Dep. at Dep. Ex. 5, Bates No. 1361-63. Ford's disability carrier Unicare approved of a paid medical leave of absence, retroactive to Freytag's initial leave of absence. *Id.*, Freytag Dep. 66.

12.     On June 2, 2014, Freytag's local union filed a "hardship" request to the National Job Security, Operational Effectiveness and Sourcing Committee ("NJSOESC"), seeking to reverse Freytag's transfer from the Romeo Engine Plant to the Sacramento HVC. Ex. A, Freytag Dep. 79-80 & Dep. Ex. 5. The NJSOESC is a joint management-union committee created by the CBA that resolves claims

arising out of the complex "preferential placement" rules. Ex. C, Roberson Decl. ¶ 8 & Dep Ex. 1; Ex. E, Roberson Dep. 15-16.

13.    Freytag's appeal to the NJSOESC cited Freytag's desire to return to Michigan because being away from his family was "difficult." Ex. A, Freytag Dep. at Dep. Ex. 5, Bates No. 1355-56. Among its exhibits were:

- an unsigned letter dated May 16, 2014 from Dr. Mastrogianis stating her "professional opinion" that Freytag "needs to be living in Michigan where he can complete his treatment and better cope with his psychosocial trauma." *Id.* at Dep. Ex. 5, Bates No. 1360.

- The aforementioned May 20 certification from Dr. Mastrogianis stating that Freytag's "mental health will stabilize quicker if relocated back to Michigan." *Id.* at Dep. Ex. 5, Bates No. 1363.

14.    Freytag wanted to transfer to Michigan with his seniority intact, because if he had he given up his seniority, he would have received a large pay cut.[1] Ex. A, Freytag Dep. 130-32 & Dep. Ex. 14. Freytag's union representatives told Voss the same. Ex. D, Voss Dep. 52-53.

15.    Although Freytag did not make a request for accommodation under the Americans with Disabilities Act in his June appeal (and, indeed, was unaware of the ADA at that time), Sacramento HVC's HR Representative William Voss recognized that Freytag's request raised an ADA issue. *Id.* at 22-23. Voss understood that the transfer request would not be a reasonable accommodation

---

[1] The 2007 CBA instituted a "two-tier" system of pay for its hourly workers. Ex. A, Freytag Dep. 33; Ex. B, Wright Decl. ¶ 5. "Legacy" employees like Freytag— *i.e.*, those with seniority prior to the 2007 CBA—received a higher rate of pay. *Id.*

based on the adverse impact it would have on other employees. *Id.* He opposed Freytag's transfer request, citing his ineligibility under the CBA. He also noted that Ford had given Freytag a leave of absence. *Id.* at 20-25 & Dep. Ex. 7.

16.     On August 8, 2014, the NJSEOSC issued a decision signed off on by both the union and management. It found that Freytag's transfer "was processed in accordance with the Preferential Placement Hierarchy and no administrative error occurred." Ex. A, Freytag Dep. 83 & Dep. Ex. 6. It also noted that:

> The provisions of Special Programs associated with termination, transfer and retirement programs are governed by strict guidelines that exist to preserve the integrity of the UAW-Ford Collective Bargaining Agreement, and the Ford-UAW Pension Plan. While the parties are sympathetic to the situation, there is no mechanism in the Master Agreement to authorize this request. In the present case, the investigation found no violation of Appendix M, N, or O of the Master Agreement. As such, the NJSOESC is unable to grant the request to transfer.

*Id.* Freytag did not appeal the NJSOESC's ruling, and does not challenge it now. *Id.* at 86-87, 98; Dkt. 17, Pl's Opp. to Prot. Order, Pg ID 248.

17.     By October 2014, Freytag's doctors would no longer certify that he was disabled. Ex. A, Freytag Dep. 96, 102-04 & Dep. Ex. 8. Freytag asked union representative Aubrey Hagler to send Voss a transfer request under the Americans with Disabilities Act. Ex. A, Freytag Dep. 92-93, 104-108 & Dep. Ex. 10. Freytag would later tell Hagler—and admitted at deposition—that he viewed his ADA request as a "last ditch effort to get back to Michigan with Ford." *Id.* at 108-11.

18.     Freytag's medical leave ended as of November 2014. *Id.* at 161. On November 17, 2014, Freytag visited Dr. Tangelos for a "recheck of stress." *Id.* at 126-27, 147 & Dep Ex. 17. Freytag said that his stress was "mild and improving" and that he wanted to come off his anti-depression medication. *Id.*

19.     On November 25, 2014, Freytag sent Hagler an email stating that he "would have no issues to come back to California for a month, two or three with the understanding there would be a transfer back," and again asked Hagler to submit a transfer request under the ADA. *Id.* at 117-121 & Dep. Ex. 14. To Freytag's knowledge, Hagler never sent Voss an ADA request, and Voss never received one from Hagler. *See id.* at 139; Ex. G, Voss Decl. ¶ 8 n.1.

20.     Also on November 25, 2014, Voss sent Freytag a "five-day" notice letter because Freytag had not returned to work after his leave ended. Ex. D, Voss Dep. 36; Ex. G, Voss Decl. ¶ 6. The notice informed Freytag that he had missed at least five work days; that he would be terminated if he did not return to work; and that if he could not return due to a disability, that he needed to provide "satisfactory evidence" of his disability. Ex. A, Freytag Dep., Dep. Ex. 18.

21.     Freytag received the five-day notice on December 6, 2014. Ex. A, Freytag Dep. 137-38. He understood the notice to mean that he could return to Sacramento, and that if he did not, he needed to provide evidence of his disability or else he would be terminated. *Id.* at 135-36. In response, Freytag sent Voss and

-6-

Plant Chairman Dwayne McBryde an email claiming that his doctors had "all determined that I am able to return to work in Michigan from my medical leave," but "all believe that if I am forced to return to the Sacramento PDC facility permanently that there will be a significant recurrence of my depression…." Based on that assertion he requested the "reasonable accommodation" of a transfer to a position in southeast Michigan. *Id.* at 137-38 & Dep. Ex. 19.

22.     Freytag did not send any medical documentation with his email, but cited "the reasons stated in my previous appeal and subsequent medical leave." At deposition, he stated that he based his claim of recurring disability on the same documents that he had attached to his June 2014 union appeal, and the documents he had sent to Unicare throughout his medical leave. *Id.* at 140-41.

23.     Neither Dr. Tangelos, Dr. Burnstein, or Dr. Mastrogianis submitted medical documentation stating that Freytag was cleared to work, but only in Michigan, or that he would suffer a "recurrence" of depression if he returned to California. Freytag never submitted any such medical documentation to Ford or Unicare. Ex. F, Kong Decl. ¶ 3 & Dep. Ex. 1; Ex. G, Voss Decl. ¶¶ 9-10, 12.

24.     After receiving Freytag's December 6 email, Voss contacted Unicare, and learned that Unicare had received no medical documentation from Freytag since November. Ex. D, Voss Dep. 41 & Dep. Ex. 19; Ex. G, Voss Decl. ¶ 10.

Voss remained in contact with Hagler, letting him know that Freytag had not submitted documentation necessary to justify his absence. Ex. G, Voss Decl. ¶ 11.

25.     The last document in Unicare's medical file from Freytag's doctors is a November 21, 2014 letter from Dr. Tangelos stating that Freytag was able to work as of November 17, 2014. Ex. F, Kong Decl. ¶ 1, Bates No. 343. The letter did not indicate that Freytag was only able to return to work in Michigan, or that he would suffer a recurrence of his disability if he returned to California. *Id.*

26. On December 9, 2014, Freytag texted Aubrey Hagler to tell him he had emailed an ADA request to Voss and McBryde. Ex. A, Freytag Dep. 142-45 & Dep Ex. 4, Bates No. P000436-38. Hagler told Freytag that he needed to submit medical documentation and "if that's not done it's a wrap." *Id.* Freytag said that "there was something in the email to him about it," and Hagler again said "[i]f you didn't get that medical extension they're going to terminate YOU. You have to dot your I's & cross your t's." *Id.* Freytag responded that "[m]y doctors will not extend my medical because they feel that I am capable of working now in Michigan." *Id.*

27.     Freytag never asked Dr. Tangelos to extend his disability leave, as Tangelos had earlier told him that he would not write the diagnosis. Freytag agreed with Dr. Tangelos, and agreed that he was well enough to work despite the stress of his divorce. Freytag did not seek another doctor who would agree to submit paperwork supporting his disability claim. Ex. A, Freytag Dep. 102-04.

28.     When asked at deposition for the "relevant times" that he contended that he was a "qualified person with a disability" as alleged in his Complaint, Mr. Freytag testified that he was disabled while on disability leave, and that his disability ended on October 31, 2014. Ex. A, Freytag Dep. 160-61; *see id.* at 138.

29.     Freytag had the option of returning to his job in California at the end of his disability leave, but he voluntarily chose not to return. He was terminated on January 12, 2014. Ex. A, Freytag Dep. 101, 112; Ex. G, Voss Decl. ¶ 12.

30.     Between March 17, 2014 and Freytag's termination on January 12, 2015, every request for a transfer made by (or on behalf of) Plaintiff Kevin Freytag to Ford Motor Company—including, but not limited to, his request(s) for transfer that cited the Americans with Disabilities Act—was for a transfer that would have maintained Freytag's full seniority, pay, and benefits. Ex. H, Joint Statement of Facts, filed as Dkt. 15, Pg ID 231-32.

31.     Between March 17, 2014 and Plaintiff's termination on January 12, 2015, Plaintiff Kevin Freytag never requested a transfer in which he proposed giving up any of his seniority, pay, or benefits. *Id.*

32.     Between April 2014 (when Freytag's temporary disability began) and September 2014, there were no open positions in southeastern Michigan filled by new hires. Ex. C, Roberson Decl. ¶ 7. Starting in September 2014, there were open positions in southeastern Michigan that were filled by new hires. *Id.* Freytag was

-9-

not eligible to transfer to these positions. He was not laid off; Sacramento HVC was not a surplus plant; and he did not fall into any of the other preferential placement categories. He was also ineligible because he had taken the Enhanced Relocation Package when transferring to Sacramento in March 2014, which made him ineligible for further transfers for 36 months. *Id.*; Ex. D, Voss Dep. 47-48.

33.   Freytag stated during his deposition that even if he did not have a right under the CBA to transfer, he believes that Ford should have allowed him to take one of the open positions in Southeast Michigan—with his seniority intact—that Ford ultimately filled with a new hire. Ex. A, Freytag Dep. 158.

34.   Every plant in southeastern Michigan that filled openings with new hires during this timeframe had existing employees with less seniority than Freytag. Ex. B, Wright Decl. ¶ 9; Ex. C, Roberson Decl. ¶ 7. Freytag admits that if he transferred to a position in southeast Michigan with his seniority intact, every employee already at the plant with less seniority than him would be bumped down in seniority order. Ex. A, Freytag Dep. 155-56.

35.   Any employee who is bumped down in seniority under the Ford-UAW CBA is disadvantaged, as most employment benefits and burdens for a unionized employee is determined by seniority—including susceptibility to layoffs. Ex. A, Freytag Dep. 149, 155; Ex. B, Wright Decl. ¶ 4; Ex. E, Roberson Dep. 38-39, 46-48; Ex. D, Voss Dep. 49-50. But when a new employee is hired, he or she

-10-

enters the plant with no seniority, and thus the hiring of a new employee does not bump down existing employees in seniority. Ex. B, Wright Decl. ¶ 8; Ex. D, Voss Dep. 50; Ex. E, Roberson Dep. 45.

36.    Seniority is one of the bedrock principles of the Ford-UAW relationship. The CBA's preferential placement rules governing transfers are complex and Ford and the UAW carefully negotiated them. *Id.* ¶ 6. The rules try to strike a balance between the competing seniority rights of employees implicated by transfers. Ex. B, Wright Decl. ¶¶ 4, 6-8; Ex. C, Roberson Decl. ¶ 9.

37.    Freytag agreed that his position is that these employees should "just have to deal with that bump in seniority so [he] could take a position even though the contract doesn't allow [him] to." Ex. A, Freytag Dep. 155-156, 158. He claims that this happened "in the mid-2000s" prior to the institution of the two-tier pay system but admits he has no evidence to support that claim, and he does not know of anyone who transferred despite not having a right to do so under the CBAs in effect since 2007 (when the two-tier pay system started). *Id.* at 156-57.

38.    Freytag wanted a transfer in order to work near family. He claims that he would not disabled in California if his family were there; and claims that he would be disabled in Michigan if his family were to leave. *Id.* at 72-74.

-11-

## INTRODUCTION

Kevin Freytag, facing imminent layoff at his plant in Romeo, Michigan, exercised a right under the Ford-UAW collective bargaining agreement to transfer, with seniority intact, to an open position at a plant in California—and accepted a large relocation allowance in exchange for waiving his right to return. When his wife sought a divorce, Freytag suffered temporary anxiety and depression, and Ford gave him paid medical leave. Freytag, however, was not satisfied with medical leave and wanted to reverse his transfer—but a joint union-management committee found that there was no contractual mechanism for him to do so.

In the meantime, his medical leave effectively resolved his condition. By November 2014, his doctors agreed he could return to work, and he reported that his stress was "mild and improving." Yet Freytag still wanted his transfer, and saw the Americans with Disabilities Act as a cudgel he could use in a "last ditch effort" to obtain that goal. Even though he *admits* that he was no longer disabled, he sent Ford an email in December 2014 seeking the "accommodation" of a transfer, claiming his doctors feared a recurrence of disability in California. He had no such medical documentation, and admitted to a union boss that he could have worked in California. In any event, his requested transfer was objectively unreasonable, both because it would have violated the contractual rights of his co-workers, and because it was for an primarily personal, not work-related, benefit.

-12-

**ARGUMENT**

A failure-to-accommodate claim under the ADA requires proof that (1) the individual is disabled within the meaning of the Act; (2) he is qualified for the position, with or without the reasonable accommodation; (3) her employer knew or had reason to know about her disability; (4) he requested an accommodation; and (5) the employer failed to provide the necessary accommodation. *Melange v. City of Center Line*, 482 F. App'x 81, 84 (6th Cir. 2012). Michigan's PWDCRA "substantially mirrors the ADA, and resolution of a plaintiff's ADA claim will generally, though not always, resolve the plaintiff's PWDCRA claim." *Donald v. Sybra, Inc.,* 667 F.3d 757, 764 (6th Cir. 2012) (internal citation omitted). Freytag cannot establish a violation of either statute.

**I.      Freytag's May 2014 Disability Was Accommodated with Medical Leave, and He Was Not Disabled—and Did Not Provide Required Proof of Disability—When He Again Requested Transfer in December 2014.**

Freytag's claims fail at the outset because Ford reasonably accommodated his May 2014 disability with medical leave rather than a contractually-forbidden transfer; and because Freytag's renewed request for leave in December 2014 came at a time when he was admittedly no longer disabled, and was unaccompanied by medical corroboration of his disability despite Ford's specific request and policy.

*First*, as to the May 2014 disability, it is well established that an employee who demonstrates a need for accommodation "cannot make his employer provide a

specific accommodation if another reasonable accommodation is instead provided." *Hedrick v. W. Reserve Care Sys.*, 355 F.3d 444, 457 (6th Cir. 2004). And medical leave is a reasonable form of accommodation—particularly when the event triggering the need for accommodation is a limited-duration medical emergency. *See Cehrs v. Ne. Ohio Alzheimer's Research Ctr.*, 155 F.3d 775, 778, 783 (6th Cir. 1998). Here, it is undisputed that although Freytag never specifically invoked the ADA in connection with the anxiety and depression caused by his wife's sudden decision to seek a divorce, his supervisor granted Freytag a personal leave of absence in May 2014, that later was converted to a paid medical leave once Freytag obtained a medical diagnosis that he was unable to work. Facts 9, 11. That medical paperwork expressly indicated that his disability was expected to be of limited duration. Fact 11. Medical leave was a reasonable accommodation, and Freytag has no viable claim because he wanted a transfer instead.

*Second*, with respect to the December 2014 ADA request, it is established that an "employer need not take the employee's word for it that the employee has an illness that may require special accommodation," and instead may "confirm or disprove the employee's statement." *E.E.O.C. v. Prevo's Family Mkt., Inc.*, 135 F.3d 1089, 1094 (6th Cir. 1998)). And if an employee is *not* disabled or refuses to establish that he is disabled, he is not entitled to an accommodation. *Penny v. UPS*, 128 F.3d 408, 414-15 (6th Cir. 1997); *Cash v. Siegel-Robert, Inc.*, 548 F. App'x

330, 335 (6th Cir. 2013) (rejecting reasonable accommodation claim where plaintiff "did not ask [his employer] for additional time on medical leave" or "provide medical documentation demonstrating" need for accommodation).

Here, Freytag *admits* he was no longer disabled by December 2014. At deposition, when directly asked about the contention in his complaint that he was a "qualified person with a disability," Freytag said that his disability ended on October 31, 2014. Fact 28. That is consistent with his doctors' refusal to extend his disability leave beyond October because he was well enough to work. Facts 17-18, 25. Freytag, in contemporaneous text messages to a union boss, admits that he could have worked in California, but he refused to do so unless guaranteed a transfer. Fact 19. And his ADA accommodation request conceded the lack of a present disability, asserting (incorrectly, as discussed below) only that his doctors feared a "recurrence" of his disability in California. Fact 21. By December 2014, Freytag was—in his own words—using the ADA as a "last ditch effort" to obtain a transfer for personal reasons. Fact 17. That is not what the ADA is for.

In any event, Freytag never submitted medical documentation to support his claim that he would suffer a recurring disability if he returned to California, despite the end of his medical leave. Freytag admits he was aware of the need to send such documentation, as Ford's five-day notice letter (which triggered the ADA request) *expressly* told him that he needed to submit medical documentation to justify his

failure to return to work. Facts 20-21. And Freytag's union representative, who was in contact with HR, reiterated to Freytag that Ford *required* medical documentation. Fact 26. Yet Freytag provided nothing new, citing only the papers from May 2014 and his expired medical leave. Facts 22-23, 27. And those old papers said (1) that Freytag's disability would be of limited duration; (2) implied that Plaintiff *would* ultimately be able to return to California;[2] and (3) as of November 2014, certified that Freytag could return to work, *without* the condition that he remain in Michigan. Facts 11, 13, 25. Indeed, he *never* submitted paperwork substantiating his newly-asserted claim that *all three* doctors felt he could work in Michigan but *not* California. Fact 23. The Sixth Circuit has rejected a reasonable accommodation claim under similar circumstances. *Cash*, 548 F. App'x at 335. This Court should as well.

## II.   Freytag's Proposed Accommodation of a Transfer For His Temporary Anxiety and Depression Was Unreasonable.

An employee claiming a right to an accommodation "is saddled with the burden of proposing an accommodation and proving that it is reasonable."[3]

---

[2] Dr. Mastrogianis's unsigned May 16 letter spoke of Plaintiff receiving "treatment" in Michigan, and her subsequent May 20 certification said that Plaintiff's temporary disability would last between 3-6 months, but would resolve *faster* in Michigan—*i.e.*, that implicitly, that it would *also* resolve with treatment in California, albeit at a slower pace. Fact 13.

[3] Plaintiff has claimed that Ford did not engage in an "interactive process." As the record shows, that is not true; Ford management did engage with Plaintiff after he informed them of his situation, granted him personal and then medical

-16-

*Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 202 (6th Cir. 2010); *see also Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 491 (6th Cir. 2013) ("plaintiff must propose an accommodation that is objectively reasonable to employers in general"). Freytag's proposed accommodation—that Ford transfer him to a facility near family members in Michigan—is unreasonable.

### A. Freytag's proposed transfer would have violated the rights of other employees under the Collective Bargaining Agreement.

It is well-established that an employer is not required to violate the collective-bargained rights of other employees in order to accommodate an employee's alleged disability. *See, e.g.*, *Henschel v. Clare Cty. Rd. Comm'n*, 737 F.3d 1017, 1025 (6th Cir. 2013) ("there is no requirement that an employer violate a collective bargaining agreement … in order to return a disabled employee to work."); *Hedrick*, 355 F.3d at 457 (employer not "required to waive legitimate, non-discriminatory employment policies or displace other employees' rights in order to accommodate a disabled employee."); *Burns v. Coca-Cola Enterprises*,

_____

leave, and encouraged him to submit documentation to justify his continued absence even after he failed to return to work in November 2014. Facts 9, 11, 20, 24. In any event, an alleged failure to engage in the interactive process is not an independent claim, and an employer is "not legally required to counteroffer" an unreasonable proposed accommodation. *EEOC v. Ford Motor Co.*, 782 F.3d 753, 766 (6th Cir. 2015) (en banc); *accord Arthur v. Am. Showa, Inc.*, 625 F. App'x 704, 711 (6th Cir. 2015) (duty to engage in interactive process not triggered due to plaintiff's "failure to request a reasonable accommodation in the first place."); *cf. Deister v. AAA Auto Club of Mich.*, 91 F. Supp. 3d 905, 928 (E.D. Mich. 2015) ("an employer is not liable for failing to engage in the interactive process unless the plaintiff can show that a reasonable accommodation was possible.")

*Inc.*, 222 F.3d 247, 257-58 (6th Cir. 2000) ("Employers are not required to … violate other employees' rights under a collective bargaining agreement" to "accommodate a disabled individual," including policies regarding "entitlements to intra-company transfers").

Freytag has suggested that this line of authority conflicts with *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391 (2002). Not so. In *Barnett*, the Court held that it is presumptively unreasonable to allow a disabled employee to violate the rules of a seniority system—even though the seniority system there was *not* collectively-bargained, but imposed by management. *Id* at 403-04. Seniority rules "provide[] important employee benefits by creating, and fulfilling, employee expectations of fair, uniform treatment," including "steady and predictable advancement" and—of "greatest importance to employees"—who will be laid off during a reduction in force. *Id.* at 404-05. Thus, "the employer's showing of violation of the rules of a seniority system is by itself ordinarily sufficient" to render the accommodation unreasonable.[4] *Id.* at 405.

Here, Freytag is not only trying to avoid a seniority system, he is attempting to avoid the consequences of a complex, *collectively bargained* seniority system. Facts 3, 36. Freytag's proposal that he be able to transfer to an open position at a

---

[4] Any departure from this general rule requires the *employee* to show "special circumstances" that would alter the employees' expectations under a seniority system—such as the employer's retention of a unilateral, frequently-exercised right to change the seniority rules. *Id.* at 405.

plant in Michigan would violate the rights of other employees under the collective bargaining agreement, and undermine their reasonable expectations of fair, uniform treatment under the seniority rules. Under the CBA, an employee who transfers from one plant to another retains his or her seniority. Fact 3. When a person transfers with seniority intact, all less-senior employees already at the plant will be bumped down in seniority order, disadvantaging them with respect to layoffs and job benefits. Facts 34-35. But, under the CBA, the risk that some employees might be negatively affected by a transfer is counterbalanced by the fact that employees cannot transfer at will; rather, intra-plant transfers are limited to a narrow set of circumstances—nearly all of which relate to putting a laid-off employee back to work, or preventing an employee from being involuntarily laid-off in the first place. Facts 3, 36. If open positions remain after CBA-authorized transfers are exhausted, the positions are filled by new hires, who enter with *no* seniority, and thus with no detrimental effect on current employees. Fact 35. Union employees at Ford thus justifiably expect that, absent specifically delineated circumstances, they will maintain their seniority standing at their plant and will not have that standing eroded by more-senior transferees. Fact 36.

Freytag wishes to upend these expectations for his own benefit, proposing that Ford should have let him transfer, with seniority intact, despite the fact that (1) he was not eligible under the terms of the CBA, as a joint labor-management

committee found; and (2) he *expressly* waived his contractual right to return or to initiate *any* further transfers for 36 months by taking a $30,000 "enhanced relocation package." Facts 5-6, 16, 30-33. He admits that his proposed transfer would bump down other employees in seniority order at whatever plant he entered, but his position is that those employees should just have to deal with it, regardless of their justifiable expectation that Freytag has no contractual right to be in their plant. Facts 34-37. That is objectively unreasonable. Ford cannot simply violate the CBA, nor is it required to transfer Freytag when that transfer would disadvantage dozens or hundreds of Freytag's putative co-workers at a new plant.[5]

Indeed, allowing Freytag to bypass the contractual rules would cause significant disruption. Affected employees would likely have legitimate contractual grievances that would be difficult, if not impossible, to properly remedy. Fact 36; Ex. B, Wright Decl. ¶ 10. And if Freytag were allowed to transfer due to his personal hardship, others with similar personal hardship will demand the same, setting off a disruptive ripple effect that would jeopardize the integrity of the CBA

---

[5] *See, e.g.*, *Kempter v. Mich. Bell Tel. Co.*, 534 F. App'x 487, 492 (6th Cir. 2013) (holding proposed transfer to forthcoming "vacant" position was unreasonable, where transfer would cause "another employee's rights [to] be displaced"); *Lockard v. Gen. Motors Corp.*, 52 F. App'x 782, 786-87 (6th Cir. 2002) (holding proposed accommodation of a transfer unreasonable where it required GM to "violat[e] its obligations under the collective bargaining agreement"); *Weeks v. Union Pac. R.R. Co.*, 137 F. Supp. 3d 1204, 1221 (E.D. Cal. 2015) (holding transfer to another "zone" with seniority rights intact unreasonable, where CBA required transfer to be without seniority).

and the seniority expectations of Ford's workforce. *See id.* & Facts 16, 36. That is *precisely* what the Supreme Court sought to avoid in *Barnett*. *See* 535 U.S. at 404-05 (holding that requiring management to make case-by-case discretionary accommodation decisions "might well undermine the employees' expectations of consistent, uniform treatment—expectations on which the seniority system's benefits depend.") Freytag's proposed transfer is not a reasonable accommodation.

### B. Freytag's request to transfer to a facility closer to home is unreasonable as a matter of law.

The Sixth Circuit has recently agreed that "although an employer is required to make reasonable accommodations to eliminate barriers for a disabled employee in the workplace, the employer is not required to eliminate barriers outside the workplace that make it more difficult for the employee to get to and from work," such as providing for an easier commute.[6] *Regan v. Faurecia Auto. Seating, Inc.*, 679 F.3d 475, 480 (6th Cir. 2012) (quoting *Robinson v. Bodman*, 333 F. App'x 205, 208 (9th Cir.2009)). In *Regan*, the plaintiff had narcolepsy, and wanted to

---

[6] *See also, e.g.*, *LaResca v. AT&T*, 161 F. Supp. 2d 323, 333 (D.N.J. 2001) ("[T]he change to day shift sought by Plaintiff is not an 'accommodation,' that it is legally obligated to provide, but is simply a request for an easier, more convenient commute."); *Salmon v. Dade Cnty. Sch. Bd.*, 4 F. Supp. 2d 1157, 1163 (S.D. Fla. 1998) ("forced transfers are not reasonable accommodations as a matter of law" where related to "barriers which exist *outside* the work environment") (internal citation and quotation marks omitted); *Blickle v. Ill. Dep't of Children & Family Servs.*, 2015 WL 5693081, at *4 (N.D. Ill. Sept. 28, 2015) ("activities that fall outside the scope of employment, such as commuting to and from a job location [are] outside the responsibility of the employer under the ADA" and finding that transfer to office 7 miles away to provide shorter commute not reasonable).

modify her schedule so that her commute would happen during a time with less traffic. *Id.* The Court held that the ADA did not require the employer to accommodate this request, and granted summary judgment. *Id.*

*Regan* is consistent with the EEOC's interpretive guidance for the ADA, which recognizes that the obligation to reasonably accommodate "does not extend to the provision of adjustments or modifications that are primarily for the personal benefit of the individual with a disability." 29 C.F.R. § Pt. 1630, App. at § 1630.9. Thus, "if an adjustment or modification is job-related, *e.g.*, specifically assists the individual in performing the duties of a particular job, it will be considered a type of reasonable accommodation." *Id.* But "if an adjustment or modification assists the individual throughout his or her daily activities, on and off the job, it will be considered a personal item that the employer is not required to provide." *Id.*[7]

Freytag's transfer request here is substantively identical to the commuter cases. Just as the commuter wants to transfer closer to her own home to alleviate the symptoms of her disability, Freytag wants to transfer closer to his family home to alleviate the symptoms of *his* alleged disability. If anything, Freytag's demand seeks even more of a "personal benefit" than a request for a shorter commute, which at least has a tenuous relationship to the workplace. This proposed transfer

---

[7] *See also, e.g*, *Rask v. Fresenius Med. Care N. Am.*, 509 F.3d 466, 471 (8th Cir. 2007) (citing interpretive guidance to hold that Plaintiff's proposed "ability to take sudden, unscheduled absences would not have assisted [her] in performing the duties of her particular job; they would have been for her personal benefit.");

relates primarily to Freytag's off-the-job activities; he would not be spending time with family while working the assembly line. And nothing about the Sacramento HVC facility itself operates as a barrier to Freytag's ability to work; as Freytag admitted, he would be able to work in California if his family moved there, and would claim an inability to work in Michigan if his family moved away. Fact 38.

It is objectively unreasonable for Freytag to ask Ford for an accommodation that has nothing to do with the workplace, and benefits Freytag primarily in his personal life.[8] Under Freytag's theory, every time an employee claimed stress, anxiety, or depression arising out of a personal obligation—whether due to a sick parent back home, or separation from a spouse who takes a new job in a different city—an employer would be required to reshuffle its workforce. But that "would impose a wholly impractical obligation on … any employer," who could "never achieve more than temporary compliance because compliance would depend entirely on" that employee's personal life stresses at any given time. *Gaul v. Lucent Techs., Inc.*, 134 F.3d 576, 581 (3d Cir. 1998) (rejecting request for transfer to avoid stress from co-workers); *Lewis v. Zilog, Inc.*, 908 F. Supp. 931, 948 (N.D. Ga. 1995) ("courts have held that transferring disabled individuals solely to allow

_____

[8] *See Brookins v. Indianapolis Power & Light Co.,* 90 F. Supp. 2d 993, 1005 (S.D. Ind. 2000) (holding that employee's request that employer continue sending him to doctor for treatment of his depression and anxiety necessary for him to work was unreasonable, as his condition "not only prevented him from going to work, but also prevented him from being a functional person" and thus, the requested accommodation was "primarily for his personal benefit").

-23-

the employee to work in a different setting" is not a reasonable accommodation).

For this reason too, Freytag's proposed accommodation is unreasonable.

## CONCLUSION

The Court should grant the motion for summary judgment.

Respectfully submitted,

*s/Thomas J. Davis*
Elizabeth P. Hardy (P37426)
Thomas J. Davis (P78626)
Kienbaum Opperwall Hardy
  & Pelton, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
ehardy@kohp.com
Dated:  June 10, 2016          tdavis@kohp.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 10, 2016, I electronically filed the foregoing document with the Clerk of the Court using the ECF system which will send notification of such filing to all parties on record.

*s/Thomas J. Davis*
Thomas J. Davis
Kienbaum Opperwall Hardy
  & Pelton, P.L.C.
280 N. Old Woodward Avenue, Suite 400
Birmingham, MI  48009
(248) 645-0000
tdavis@kohp.com
(P78626)

-25-